George M. BRADLEY, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20037.

United States Court of Appeals,
Eighth Circuit.

Aug. 31, 1971.

Thomas M. Dawson, Leavenworth, Kan., for appellant.

Claude H. Freeman, Asst. U. S. Atty., Allen L. Donielson, U. S. Atty., Des Moines, Iowa, for appellee.

Before ALDRICH,* LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

This case arises from an order of this court approving a stipulated delayed appeal. Bradley was convicted in March 1963 under 18 U.S.C.A. §§ 2113(a) and (d) for aggravated bank robbery and given concurrent sentences of 20 and 25 years, respectively. His attorney did not appeal the conviction. In the past Bradley has filed several 28 U.S.C.A. § 2255 motions, all of which have been denied by the district courts. Two of these denials were affirmed on appeal. Bradley v. United States, 347 F.2d 121 (8 Cir. 1965), and Bradley v. Ciccone, 409 F.2d 217 (8 Cir. 1969). On a third appeal from a denial of a § 2255 motion; a panel of this court entertained defendant's contention that he had not waived his right to appeal and that he had not been informed of his right to appeal by either the trial court or his counsel. Under the authority of Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) and Williams v. United States, 402 F.2d 548 (8 Cir. 1968), the government conceded that counsel should be appointed[1] and that the defendant be given a delayed appeal on the merits of his case. This court approved the procedures stipulated by order dated July 13, 1970. We ordered a new briefing schedule and assumed jurisdiction of the appeal on the merits. The present

---

* Of the First Circuit, sitting by designation.

1. Although counsel was appointed, appellant later was financially able to and did retain his own counsel.

appeal is the culmination of this procedure. We affirm the judgment of conviction under § 2113(a); on the other hand, we find a threat to use a simulated bomb insufficient to sustain defendant's conviction for robbery and assault under § 2113(d).

Although defendant complains of many errors, his basic claims are: (1) that the government failed to prove beyond a reasonable doubt that the defendant was competent at the time of the commission of the offense; (2) that he was not afforded a proper arraignment in that he was arraigned and determined to be incompetent to stand trial in the same proceeding; (3) that he was denied due process in the district court's refusal to allow discovery of defendant's Veterans Administration hospital records, which were in the hands of the prosecution; (4) that the trial court erred in admitting into evidence testimony which related to his participation in another robbery occurring four months before in the State of Florida; (5) that there was error in the instruction on the burden of proof of insanity; and (6) that his conviction and sentence under § 2113(d) was improper. We discuss these contentions seriatum.

The robbery attempt took place on May 1, 1961, in Davenport, Iowa. The defendant approached an officer of a savings and loan company during business hours, handed him a note and demanded $60,000 or he would blow up the place with dynamite that he carried in a brown paper bag. The defendant also told the bank official that he had a gun. The official looked in the sack and observed what appeared to be a clock, wires and dynamite. He pulled the sack away from the defendant and threw it across the room and the defendant ran. Shortly thereafter the defendant was apprehended by a police officer within a block of the bank and taken to county jail. It was discovered that the sack contained only paper and other harmless items assembled so as to simulate a bomb.

On July 28, 1961, a two count indictment was returned. Court appointed counsel moved for a pretrial determination of defendant's competency. Examinations were begun by a psychiatrist at the Federal Medical Center in Springfield, Missouri, in September of 1961. The Medical Center's diagnosis was "Schizophrenic Reaction, Paranoid Type, chronic, severe." In December 1961 the trial court certified the defendant to be legally incompetent to stand trial and ordered him temporarily committed to the custody of the Attorney General. The defendant was returned to Springfield for treatment. In December 1962 the Medical Center certified the defendant competent to understand the nature of the charges against him and to properly assist his counsel in the preparation of a defense. The trial court determined defendant competent to proceed; trial was then had in March 1963.

■ Although the government must prove the defendant to be sane beyond a reasonable doubt, it may generally rely on the presumption of sanity to carry its legal burden unless evidence is adduced which refutes it. Once the defense produces evidence to rebut the presumption, the proof of sanity beyond a reasonable doubt is at equipoise and the government must come forth with additional evidence to sustain its burden. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). To analyze the government's burden in the proper perspective, we first view the defendant's evidence which rebutted the presumption of sanity.

Dr. Keith, then the Acting Chief of the Neuropsychiatric Service at Springfield, Missouri, was appointed by the court to make an independent medical examination of the defendant. Based on a three month study of the defendant, the examination of past records, and evaluation tests by psychological and psychiatric examinations, a five member psychiatric staff at Springfield jointly concluded that the defendant was suffering from a severe mental illness diagnosed as "schizophrenic reaction, paranoid type." Dr. Keith described this as a form of psychosis in which the defend-

ant at times was separated from reality and suffering from delusions. The illness was "manifested by excessive brooding and paranoid ruminations—that is thinking, thoughts, preoccupation with thoughts of revenge against some object or person, feelings of hopelessness and despair and anxiety." Dr. Keith was called as an expert witness by the trial court. He examined the defendant again before testifying. He testified that the defendant was suffering from the same mental illness on May 1, 1961, the date of the offense, and that he was controlled and governed by subconscious factors which caused him to attempt the bank robbery. He opined that defendant had a "strong unconscious need to be caught and placed in an institution because he felt he was becoming psychotic." Also included in Dr. Keith's testimony was the report of a Veterans Administration examination of defendant in 1956. In that report three psychiatrists concluded that the correct diagnosis of Bradley at that time was "schizophrenic reaction, paranoid type, partial remission."

The defendant's mother testified she had last been with the defendant in late 1960 and that he appeared to her to be mentally ill at that time. She related that the defendant had been discharged from the service in 1944 with a 60 percent disability suffering from "shell shock," resulting in "anxiety neurosis." This disability was later reduced to 30 percent.

▋ Defendant's evidence was clearly sufficient to overcome the presumption of sanity. The question before us is whether the government has adduced sufficient credible proof that it may be said that reasonable men may find that on May 1, 1961, the defendant was sane beyond a reasonable doubt. In determining the legal sufficiency of the government's proof as to guilt beyond a reasonable doubt, a court must view the

government's evidence as to whether it excludes every other hypothesis of guilt. See United States v. Edwards, 443 F.2d 1286 (8 Cir. 1971) ; United States v. Jones, 418 F.2d 818, 826 (8 Cir. 1969), and cases cited therein.[2] When assessing whether the government has carried its burden of proof, it is well settled the evidence must always be reviewed in the light most favorable to the government. United States v. Edwards, supra. This does not mean, however, that the burden has been sustained where equivocal inferences may be drawn from the government's proof. Cf. Lerma v. United States, 387 F.2d 187 (8 Cir. 1968), cert. denied 391 U.S. 907, 88 S.Ct. 1658, 20 L.Ed.2d 421 (1968).

After a thorough review of the record, we are satisfied that the government has sustained its legal burden. The government's medical testimony came from Dr. Smith, a psychiatrist who had examined the defendant on three occasions over a two year period between 1956 and 1958. In 1956 Dr. Smith concluded that Bradley was without active psychosis. Although evidence before or after the time of the commission of the offense may be relevant in the overall consideration of the sanity issue, Dr. Smith's testimony does not rebut Dr. Keith's hypothesis that the defendant lacked control and volition on May 1, 1961. On cross-examination it was brought out that the Veterans Administration board referred to in Dr. Keith's testimony rejected Dr. Smith's 1956 evaluation. Both Drs. Smith and Keith verified that a person suffering from schizophrenic paranoia may move in and out of psychosis depending upon treatment and existing stress. If we were viewing the record solely in terms of the medical testimony as to defendant's sanity on May 1, 1961, we would have to conclude that the government's evidence does not supplant a reasonable doubt.

2. This standard is not to be confused with the propriety of instructions in cases involving circumstantial proof. Cf. Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), as discussed in *Jones*, 418 F.2d at 826, 829.

There is additional proof from lay witnesses to be considered, however. An F.B.I. agent testified that he visited the defendant on four different occasions between May 1 and May 12 while defendant was in the county jail. On the basis of his observations at these interviews he concluded that defendant was a sane person. An additional witness was the sheriff in Davenport. Defendant was in the county jail in Davenport from May until September, 1961. The sheriff testified that Bradley acted ordinary to him and did not appear to be suffering from any illness.

In Dusky v. United States, 295 F.2d 743 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962), this court held that the government may sustain its burden of proof on the issue of insanity even though it lacks medical evidence. Our court distinguished cases of other circuits which held that testimony by lay witnesses could not overcome medical testimony. The significant fact that stands out from all of the cases dealing with the issue of insanity, some holding the government has sustained its burden,[3] others holding that it has not,[4] is that each case must be determined on its own facts. It must be remembered that the principle governing expert testimony is equally relevant in weighing the evidence given by lay witnesses. The opinion of any witness is only as significant as the reasons behind the conclusion.[5] Dusky, supra at 754.

The F.B.I. agent's interviews in early May, including the day of the crime, reveal substantive factual data. The F.B.I. agent interviewed the defendant within

3. Apgar v. United States, 440 F.2d 733 (8 Cir. 1971); Tarvestad v. United States, 418 F.2d 1043 (8 Cir. 1969), cert. denied 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970); Mason v. United States, 402 F.2d 732 (8 Cir. 1968), cert. denied 394 U.S. 950, 89 S.Ct. 1288, 22 L.Ed.2d 484 (1969); Kaufman v. United States, 350 F.2d 408 (8 Cir. 1965), cert. denied 383 U.S. 951, 86 S.Ct. 1211, 16 L.Ed.2d 212 (1966); Dusky v. United States, 295 F.2d 743 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962). See also Buatte v. United States, 350 F.2d 389 (9 Cir. 1965); Turberville v. United States, 112 U.S.App.D.C. 400, 303 F.2d 411 (1962), cert. denied 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed.2d 813 (1962).

4. Brock v. United States, 387 F.2d 254 (5 Cir. 1967); Buatte v. United States, 330 F.2d 342 (9 Cir. 1964); Argent v. United States, 325 F.2d 162 (5 Cir. 1963); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); United States v. Westerhausen, 283 F.2d 844 (7 Cir. 1960); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); McKenzie v. United States, 266 F.2d 524 (10 Cir. 1959); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957); Douglas v. United States, 99 U.S.App. D.C. 232, 239 F.2d 52 (1956).

5. Mr. Justice Moody aptly phrased the applicable reasoning:

"The rule governing the admission of testimony of this character, which has been prescribed by this court for the courts of the United States, is easy of statement and administration. Where the issue is whether a person is of sound or unsound mind, a lay witness, who has had an adequate opportunity to observe the speech and other conduct of that person may, in addition to relating the significant instances of speech and conduct, testify to the opinion on the mental capacity formed at the time from such observation. [Citations omitted.] In no other way than this can the full knowledge of an unprofessional witness with regard to the issue be placed before the jury, because ordinarily it is impossible for such a witness to give an adequate description of all the appearances which to him have indicated sanity or insanity. Such testimony has been well described as a compendious mode of ascertaining the result of the actual observations of witnesses. Ordinarily, and perhaps necessarily, the witness, in testifying to his opportunities for observation and his actual observation, relates more or less fully the instances of his conversation or dealings with the person whose mental capacity is under consideration, and it is, of course, competent, either upon direct or cross-examination, to elicit those instances in detail." Turner v. American Security & Trust Co., 213 U.S. 257, 260, 29 S.Ct. 420, 421, 53 L.Ed. 788 (1909).

hours of the crime. The defendant was asked about the threatening note and he replied that he presumed it was with the rest of his personal effects taken by the police; he revealed he had asked the bank teller for $60,000; he identified himself as "John Hyland." At 8:00 a. m. on May 2, the defendant was again interviewed by the agent. At this time Bradley admitted his correct name. He refused to disclose any information because he felt that he would receive a lengthy prison sentence whether he cooperated or not and that his only hope of not going to the pen would be to stand trial and plead insanity; the defendant stated that he was well versed on matters of law, having studied considerably while in the Illinois State Penitentiary. He said that in conjunction with his intended defense of insanity he was going to subpoena various military records. Bradley told the agent when asked about the bank officer knocking the simulated bomb from his hand that this was a stupid thing to do. The agent concluded that at no time did Bradley ever impress him as being anything other than completely sane and normal in every respect. He stated that at all times the defendant seemed oriented as to time and place.

There was additional lay testimony of significant import. The defendant had held up a bank in Florida on January 15, 1961, less than four months prior to the present offense. His accomplices in that robbery were Mr. and Mrs. Elbert Cooper. The important phase of Mr. Cooper's testimony related to his association with Bradley from the early part of 1960 until January of 1961. Bradley and the Coopers were neighbors and visited back and forth frequently. When Cooper moved to Tennessee Bradley was a regular houseguest. Cooper described Bradley as acting like a normal man at all times. Bradley planned the Florida bank robbery with intricate detail. He asked Mrs. Cooper to dye her hair; he put on some kind of white cement or "new skin protein" to protect his index finger to avoid leaving fingerprints; he told the Coopers not to carry identification. Bradley and Mrs. Cooper had identical shopping bags so they could make a switch after the robbery. Bradley wore two suits of clothes (as he did in Davenport) so he could immediately change his outward appearance.

As recently written, the test of insanity in this circuit turns not only on the defendant's capacity to know the difference between right and wrong [6] (cognition), but also on his "volition" (will) and his capacity to control his conduct (choice). See United States v. Herrington, 440 F.2d 1041 (8 Cir. 1971). The trial court properly instructed on these tests.[7] We are satisfied that there exists sufficient evidence both in quantum and credibility as to defendant's capacity to commit a crime to sustain the government's burden of proof of sanity. Dr. Keith verified that the defendant's illness was such that he could move in and out of the psychotic state. His professional opinion that defendant was

6. None of the medical experts testified as to whether Bradley knew the difference between "right and wrong." Dr. Keith's response was that he could not answer in those terms because he did not know what they meant. This is perhaps one psychiatrist's answer to judicial adherence to the outdated *McNaughton* rule.

7. As this court has emphasized in Pope v. United States, 372 F.2d 710, at 736-737 (8 Cir. 1967), reversed on other grounds 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968):
"[W]e state that we expect a trial judge, in a case involving criminal responsibility, to be free in his admission of all possibly relevant evidence, to be imaginative in his charge, and to give appropriate and particular stress to the requirements of cognition, volition and capacity to control, rather than to be content with the bare bones of a traditional charge, even though it has been specifically approved by appellate opinion in the past. If this is done, effective and appropriate justice will be dispensed to the defendant who sincerely asserts legal insanity as his defense, and it will be accomplished with responsible judicial participation in each day's advance and contribution to our knowledge of the human mind."

psychotic on May 1 does not turn on evaluation of psychological tests or personal observation. True it is a trained opinion, but Dr. Keith admits that the defendant could control his actions (by an attempted escape) notwithstanding a possible subconscious desire to be caught. He admits he is advising us on "meager data"; he admits defendant was in a "gray area" of mental disorders. In *Dusky,* supra, we observed:

"It has been said, too, that the nature and quantum of the evidence which the government must produce to meet its burden so as to justify the submission of the insanity issue to the jury varies with the nature and quantum of the evidence indicating mental illness. Thus, it would seem that only slight evidence presented by the defense may be met by a comparatively small amount of evidence presented by the prosecution." 295 F.2d at 754.

Here there is not strong testimony confirming insanity on May 1. It does not require strong testimony to overcome it.

■ Until matters of the mind can be more scientifically determined, our form of criminal justice requires a testing of evidential proof by the adversary system. Although medical experts may authoritatively express their opinions as to the significance of historical events, their professional analysis must nevertheless be evaluated along with the other factual details relevant to determining a defendant's state of mind, as manifested by his demeanor, attitudes and conversations. Lay observations made over a substantial period of time may assume a more persuasive quality with jurors than even an expert's opinion based on meager data. A jury of "twelve good men and true" is still the best judge of the conduct and behavior of their peers. In the present case the government presented sufficient evidence, if believed, to establish beyond a reasonable doubt that prior to and on May 1, 1961, the defendant was acting with sufficient control and choice that he must be held criminally responsible for his conduct.

■ The other procedural issues defendant raises do not establish prejudicial error requiring reversal: (1) the absence of a proper arraignment (which we acknowledge to have been deficient since defendant was determined to be incompetent on the date the arraignment was held) does not in itself require a reversal; prejudicial error is essential to require reversal;[8] none has been suggested here;[9] (2) the denial of the Vet-

8. In Garland v. Washington, 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772 (1914), the Court held that as long as the accused has had sufficient notice of the accusation and an adequate opportunity to defend himself in the prosecution, "it cannot for a moment be maintained that the want of formal arraignment deprived the accused of any substantial right or in any wise changed the course of trial to his disadvantage." *Id.* at 645, 34 S.Ct. at 457. Adopting the dissent in Crain v. United States, 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097 (1896), the Court held:

" 'Here the defendant could not have been injured by an inadvertence of that nature. He ought to be held to have waived that which, under the circumstances, would have been a wholly unimportant formality. A waiver ought to be conclusively implied where the parties had proceeded as if defendant had been duly arraigned, and a formal plea of not guilty had been interposed, and where there was no objection made on account of its absence until, as in this case, the record was brought to this court for review. It would be inconsistent with the due administration of justice to permit a defendant under such circumstances to lie by, say nothing as to such an objection, and then for the first time urge it in this court.' " 232 U.S. at 646, 34 S.Ct. at 457.

9. Defendant relies on Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 2d 114 (1961), involving a state procedure where the defendant was found to have been procedurally prejudiced by absence of counsel at an arraignment. Cf. Collins v. Swenson, 443 F.2d 329 (8 Cir. 1971). For post-*Hamilton* cases finding no prejudice from a denial of arraignment or from a deficiency in the arraignment, see Girton v. United States, 383 F.2d 404 (9 Cir. 1967); King v. Wainwright, 368 F.2d 57 (5 Cir. 1966), cert. denied 389

erans Administration records under former Fed.R.Crim.P. 16 was not prejudicial error; the information contained in these records was brought out during the trial; Bradley's state of mind in 1956 and 1958 covered by the Veterans Administration report, although relevant, was not determinative of his capacity to commit a crime in May 1961; the undisputed testimony by both Dr. Keith and Dr. Smith is that defendant may have periods of remission where he is fully responsible for his conduct; (3) the Florida robbery was relevant to establish the requisite intent; the defendant's conduct four months before the May robbery became material to establish that he had the capacity to plan and carry out a clever scheme which was successful in the perpetration of a serious crime; his state of mind in January 1961 was as important to his ability to

form criminal intent in May 1961 as it was in September 1961 when Dr. Keith made his evaluation; [10] (4) the instruction given on the presumption of sanity did not alter the government's burden of proof; the instructions read as a whole clearly set forth that it was the government's duty to establish the defendant's sanity beyond a reasonable doubt; (5) since defendant was returned immediately to the bank he asserts he was injected into an improper lineup without counsel; this argument is specious; only one of the several eyewitnesses who testified at trial saw him briefly upon his return; assuming arguendo that this was error, it was harmless at most; (6) the defendant claims he was denied due process by the delay in his competency examination and hearing; we disagree.[11]

U.S. 995, 88 S.Ct. 499, 19 L.Ed.2d 492 (1967); cf. United States v. Hendrickson, 417 F.2d 225 (3 Cir. 1969), cert. denied 397 U.S. 1026, 90 S.Ct. 1271, 25 L.Ed.2d 537 (1970); United States v. Ridley, 134 U.S.App.D.C. 79, 412 F.2d 1126 (1969); Sweeney v. United States, 408 F.2d 121 (9 Cir. 1969); United States v. Stahl, 393 F.2d 101 (7 Cir. 1968), cert. denied 393 U.S. 879, 89 S.Ct. 181, 21 L.Ed.2d 152 (1968); McConnell v. United States, 375 F.2d 905 (5 Cir. 1967); Anderson v. United States, 122 U.S.App.D.C. 277, 352 F.2d 945 (1965); McGill v. United States, 121 U.S.App. D.C. 179, 348 F.2d 791 (1965); Black v. United States, 348 F.2d 159 (9 Cir. 1965), cert. denied 383 U.S. 973, 86 S.Ct. 1282, 16 L.Ed.2d 311 (1966); Johnson v. United States, 333 F.2d 371 (10 Cir. 1964).

Apropos is the Tenth Circuit's admonition:

"Failure to exercise extreme care to protect the rights of the accused at every step of the proceedings before and during trial may, and often does result in a costly and time-consuming post-conviction collateral attack. We ought to be as sure as we can that nothing is done or left undone to give rise to post-conviction complaints, based on the denial of constitutional safeguards to a fair and impartial trial." *Johnson*, supra at 372-373.

10. In this determination, we do not retreat from the general principle that admission

of evidence of other crimes is prejudicial error, see United States v. Acreman, 434 F.2d 338 (8 Cir. 1970), but here the assertion of the insanity defense furnished a proper predicate for the admission of such evidence.

11. The complaint in this case was filed on May 1, 1961. Bradley's attorney did not file an 18 U.S.C.A. § 4244 motion to determine mental competency until August 15, 1961; the first Medical Center examination was not until September 1961. Bradley claims that the three month delay in filing the § 4244 motion prejudiced his ability to present a meaningful defense based on lack of competency. He relies heavily on United States v. Schultz, 431 F.2d 907 (8 Cir. 1970). That case is inapposite here. It is based on an interpretation of 18 U.S.C.A. § 3006A(e), a part of the Criminal Justice Act of 1964, which was not in effect at the time of Bradley's trial. Also *Schultz* turned on a request by counsel to obtain independent psychiatric opinion so as to counter the testimony of the Medical Center doctors. Here there was no such request by Bradley's counsel, and in any event the only psychiatric testimony supporting his defense came from the Medical Center. The intention to plead insanity was brought to the attention of the United States Attorney by letter from defense counsel dated July 18, 1963. The Grand Jury indictment was handed down on July 28. Therefore, the § 4244 motion, which was made on August 15, came with-

As a final contention Bradley urges that the government failed to prove the necessary elements to sustain a conviction for aggravated robbery under § 2113(d).[12] He received concurrent sentences of twenty years and twenty-five years,[13] respectively, under § 2113(a), entering a bank with the intent to rob, and for aggravated robbery under § 2113 (d), committing "assault" on the bank teller at the time of robbery. Bradley was not indicted under the alternative part of subsection (d), putting "in jeopardy the life of any person by the use of a dangerous weapon or device." The simulated bomb which he used to threaten the bank teller did not have the objective capacity to place life in jeopardy. Cf. United States v. Marshall, 427 F.2d 434 (2 Cir. 1970).

The fundamental issue is whether a threat to use a simulated bomb or any other fake weapon or device which lacks the objective capacity to do harm can constitute an assault under § 2113(d).

The Sixth Circuit recently faced the identical question, i. e., whether a threat by a bank robber with a simulated bomb, in that instance a soft drink can, was sufficient to constitute an "assault" under § 2113(d). United States v. Beasley, 438 F.2d 1279 (6 Cir. 1970) (Judge McCree dissenting). This is the only circuit court decision which has faced the identical issue as presented here.[14] The Sixth Circuit there affirmed a conviction finding that a threat with a simulated bomb was sufficient proof of an "assault" as used in subsection (d) of the Bank Robbery Act. Judge Celebrezze, in writing the majority opinion, observed:

"Insofar as the base provision, section 2113(a), specifies the use of 'force,' 'violence,' or 'intimidation,' something more must be required to prove robbery aggravated by assault. We believe that those additional elements are present where, as here, the robber is shown to have possessed the intent to generate apprehension on the part of his victim, and where the victim, in fact, is shown to have been placed in reasonable apprehension by the robber's conduct, regardless of the

in a month of formal notice of a question of mental competency and within two weeks of the indictment. Assuming Dr. Keith could have examined the defendant on the day of the offense, shy of some scientific evaluation or objective testing, the existence of which we are not aware, his testimony would still have to be based on the defendant's same behaviorial pattern on which he premised his ultimate conclusion at trial. Under the evidence the issue would still be one of fact for the jury. We find no serious prejudice here.

12. The relevant statutory provisions state:
"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; * * * Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."
"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in

jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

13. Bradley additionally asserts that he was convicted of two separate crimes [§ 2113 (a) and § 2113(d)] arising out of a single incident thereby illegally pyramiding the sentences. See, Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957). However were this the only problem, the intent of the district court would govern and in this instance the greater sentence of twenty-five years would be affirmed. See, Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); Jones v. United States, 396 F.2d 66 (8 Cir. 1968), cert. denied 393 U.S. 1057, 89 S.Ct. 695, 21 L.Ed.2d 697 (1969).

14. The government relies on Caldwell v. United States, 338 F.2d 385 (8 Cir. 1964), where a simulated bomb was also used. This court's opinion, however, discloses that Caldwell was indicted only under § 2113(a). An investigation of the district court file verifies that violation under § 2113(d) was not charged in the original indictment.

robber's ability actually to inflict harm. *See* United States v. Rizzo, 409 F.2d 400, 403 (7th Cir. 1969); Baker v. United States, 412 F.2d 1069, 1071–1072 (5th Cir. 1969)." 438 F.2d at 1282.

Judge McCree, in dissent, answered that:

"In order to give lawful meaning to Congress' enactment of the aggravating elements in 18 U.S.C. § 2113(d), the phrase 'by the use of a dangerous weapon or device' must be read, regardless of punctuation, as modifying both the assault provision and the putting in jeopardy provision. *See* United States v. Shreveport Grain & El. Co., 287 U.S. 77, 82–83, 53 S.Ct. 42, 77 L.Ed. 175 (1932); Egyptian Supply Co. v. Boyd, 117 F.2d 608, 611–612 (6th Cir. 1941)." 438 F.2d at 1284.

Our analysis leads us to the result reached by Judge McCree's dissent—that the sentence for aggravated robbery under § 2113(d) cannot be sustained. Both the majority and the dissent in *Beasley* observed that the term "assault" as used in § 2113(d) denotes an aggravated crime going beyond that which is specified in § 2113(a). See, United States v. Beasley, supra, 438 F.2d at 1282 and 1283. This court early recognized that the Bank Robbery statute created three escalating degrees of bank robbery.

"[F]irst, that which was accompanied by force or putting in fear; second, that which was accompanied by assault or putting lives in jeopardy; and, third, that which was accompanied by killing or kidnapping. Proof of robbery of the second class would also prove robbery of the first class * * *." Hewitt v. United States, 110 F.2d 1, 11 (8 Cir. 1940).

■ By its usage, the term "assault" in subsection (d) requires definition equated to a crime of aggravation.[15] In its aggravated sense, we have concluded "assault" within subsection (d) means more than having an intent to, and in fact, generating a reasonable apprehension in a victim. Our analysis leads us to conclude that assault as used in subsection (d) means in addition a threat or attempt to inflict bodily harm *coupled with the present ability* to commit violent injury upon the person of another.

An early definition of common law criminal assault was stated as "an unlawful attempt coupled with a *present ability* to commit a violent injury upon the person of another." (Emphasis ours.) United States v. Barnaby, 51 F. 20, 21 (Cir.Ct.D.Mont.1892); Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292, 295–96 n. 14 (1939); Taylor, Postal Frauds and Crimes 56–57 (1931).[16]

---

15. The Supreme Court has provided guidelines in determining the meaning to be given a statutory crime: "And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952).

16. In a mail robbery case, Conway v. United States, 1 F.2d 274, 275 (7 Cir. 1924), the Seventh Circuit quoted from Russell on Crimes at 1019, which observed: "An assault is an attempt or offer with force and violence to do a

corporal hurt to another * * * So drawing a sword or bayonet * * * and presenting a gun at a person who is within the distance to which the gun will carry * * * or any other similar act accompanied with such circumstances as denote at the time an intention *coupled with a present ability* of using actual violence against the person of another will amount to an assault." (Emphasis ours.)

In a more recent application the Fifth Circuit in Shaffer v. United States, 308 F.2d 654 (5 Cir. 1962), dealing with a prosecution for assault under 18 U.S.C. § 113(c), the court said, "The proof of malice is not a necessary ingredient of an assault. * * * It is sufficient if, viewed from the standpoint of the victim, there is an apparent intent to commit a battery *coupled with a present ability to do so.*" (Emphasis ours.) Id. at 655.

In contrast, the government here urges the definition of assault as used in Ladner v. United States, 358 U.S. 169, 175, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958). The Supreme Court had under consideration interpretation of 18 U.S.C.A. § 254 (now § 111) dealing with assault of federal officers. This statute provided a three year sentence for assault and a ten year sentence where the assault was accomplished with "a deadly or dangerous weapon." The Supreme Court observed in dicta that assault is "ordinarily * * * committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm." 358 U.S. at 177, 79 S.Ct. at 213.[17]

The term assault has acquired variout meanings under common law and statutory usage. Where an individual had pointed an unloaded pistol at another, the court in Price v. United States, 156 F. 950 (9 Cir. 1907), observed that the defendant could not be convicted of assault wth a dangerous weapon, but only "simple assault." The Ninth Circuit relied on Bishop, Criminal Law, Vol. 2, § 53 (3d ed.), where the author stated: "There is no need for the party assailed to be put in actual peril, if only a well-founded apprehension is created; for his suffering is the same in the one case as in the other, and *the breach of the public peace* is the same." (Emphasis ours.)[18] The assault involved was not deemed aggravated conduct meriting greater punishment. Under § 2113(d) we are concerned with aggravated conduct committed while perpetrating a serious crime. Conduct amounting to a felonious entry into the bank, taking money by force or intimidation is already encompassed under § 2113(a) and subject to punishment up to twenty years. The possible increase in sentence under § 2113(d) because of the "assault" is five years in prison, not an additional moderate fine and jail term as is typical with simple assault. We thus find definitions of assault in the *Ladner* and *Price* cases rest upon the character of the offense charged. To uniformly define assault in every instance fails to perceive the diverse nature of an assault and its correlative punishments.

We thus conclude that the overall test of § 2113 manifests the congressional intent that assault in subsection (d) was not intended to be consummated by mere proof of the actor's apparent intent and the reasonable apprehension of the victim.[19] Congress otherwise would not have inserted the assault provision within subsection (d). Appropriate here

---

See also, Burke v. United States, 400 F.2d 866 (5 Cir. 1968), cert. denied 395 U.S. 919, 89 S.Ct. 1771, 23 L.Ed.2d 237 (1969).

17. It is clear the Court was not referring to "assault" in the aggravated sense as we are here. In § 254 assault was combined with other terms such as "resists, opposes, impedes, intimidates, or interferes" indicating a similarity of nature and degree. The maxim of *noscitur a socis*, knowing a word from its associates, there relates "assault" to its simplest form and meaning. The aggravated offense in § 254, carrying a greater punishment, speaks to the punishment of such activities while using a deadly or dangerous weapon.

18. The court further cited Commonwealth v. White, 110 Mass. 407, where the Supreme Court of Massachusetts said, "It is not the secret intent of the assaulting party, nor the undisclosed fact of his ability or inability to commit a battery that is material; but what his conduct and the attending circumstances denote at the time to the party assaulted. It is the outward demonstration that constitutes the mischief which is punished as a *breach of the peace*." (Emphasis ours.) It is apparent the *Price* decision equates simple assault in terms of its lowest order to a breach of the peace.

19. Likewise, we find significant the common law definition of simple robbery—a felonious taking by violence or putting a victim in fear—compares closely to the language in § 2113(a) ("force and violence, or by intimidation"). See United States v. Nedley, 255 F.2d 350 (3 Cir. 1958); Norris v. United States, 152 F.2d 808 (5 Cir. 1946).

is the Supreme Court's statement in an unrelated action:

"To borrow the homely metaphor of Judge Aldrich in the First Circuit, 'If there is a big hole in the fence for the big cat, need there be a small hole for the small one?' The statute admits a reasonable construction which gives effect to all of its provisions. In these circumstances we will not adopt a strained reading which renders one part a mere redundancy. See, e. g., United States v. Menasche, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615." Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307–308, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

The Second Circuit has interpreted the "jeopardy" provision of § 2113(d) in a similar vein, "If we did not require a finding that lives were objectively in danger, it would be impossible to distinguish subsection (d) of section 2113 from subsection (a) which prohibits robbery 'by force or violence or intimidation.'" United States v. Marshall, supra, 427 F.2d at 437.

 In the statutory syntax a comma separates the "assaults any person" clause from the "jeopardy" clause. With the placement of the comma after "person," several cases have held that subsection (d) is to be read disjunctively.[20] United States v. Rizzo, 409 F.2d 400, 402 (7 Cir. 1969), cert. denied, 396 U.S. 911, 90 S.Ct. 226, 24 L.Ed.2d 187; Gant v. United States, 161 F.2d 793 (5 Cir. 1947); United States v. Murray, 149 F.2d 932 (3 Cir. 1945). We need not decide this question. We simply hold here that proof of an "assault" under § 2113(d) requires not only that a bank robbery must intend and, in fact, create a reasonable apprehension in the victim[21] but must additionally have an objective capability to cause physical harm to the victim by the means threatened. The use of a simulated weapon, a "bomb" made of paper, as found here, does not meet those requirements. We therefore hold Bradley's conviction and extra five year sentence under § 2113(d) improper.

Judgment affirmed as to the conviction under § 2113(a). The judgment under § 2113(d) is vacated and ordered dismissed.

---

20. When the Federal Bank Robbery Act, 18 U.S.C.A. § 254, was reported out of the House Committee on the Judiciary as a bill, the committee report portrayed the language somewhat differently than what later appeared in the statute, to wit, "If an assault be committed or the life of any person put in jeopardy, by use of a dangerous weapon etc. * * *" H.R.Report No. 1461, 73d Cong., 2nd Sess. 29 (1934).

21. It may even be that a reasonable apprehension of the victim would not in all instances be essential to prove "assault" under § 2113(d) where an actual battery takes place. Under the concept of assault as an attempt to commit a battery, apprehension on the part of the victim is not an essential element of that type of assault. United States v. Rizzo, supra, 409 F.2d at 403; Anderson v. Crawford, 256 F. 504, 507 (8 Cir. 1920).