James LeRoy **IVERSON**, Appellee,

v.

**STATE OF NORTH DAKOTA,**
Appellant.

No. 72–1600.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1973.

Decided June 11, 1973.

Robert A. Alphson, Grand Forks, N. D., and Mart R. Vogel, Fargo, N. D., for appellant.

John G. Shaft, Grand Forks, N. D., for appellee.

Before LAY and ROSS, Circuit Judges, and NICHOL,* District Judge.

LAY, Circuit Judge.

The petitioner, James LeRoy Iverson, was found guilty in the Grand Forks County District Court of North Dakota of the strangulation murder of two young women. His conviction was affirmed by the North Dakota Supreme Court. State v. Iverson, 187 N.W.2d 1 (N.D.1971), cert. denied, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273. Thereafter petitioner sought and was granted on August 31, 1972, a writ of habeas corpus in the federal district court. 347 F.Supp. 251 (D. N.D.1972). The State of North Dakota appeals. We reverse and remand with directions.

The federal district court for the District of North Dakota, the Honorable Ronald N. Davies presiding, reviewed the state proceedings and, without evidentiary hearing, determined (1) that during petitioner's state trial there was received into evidence certain items which were obtained by a search warrant issued without probable cause; (2) that the petitioner was denied due process of law since he was mentally incompetent at the time of his preliminary hearing; and (3) that the petitioner had been compelled to be a witness against himself at the State's Attorney's Inquiry contrary to his constitutional privilege against self-incrimination. Petitioner raised in the federal district court the additional ground that he was denied effective assistance of counsel by reason of his trial counsel's incompetency. The trial judge found it unnecessary to pass on this latter question in view of the grant of the writ of habeas corpus on the other grounds.

* The Honorable Fred J. Nichol, Chief Judge of the United States District Court for the District of South Dakota, sitting by designation.

The bodies of Carol Mayers and Diane Bill were discovered in Miss Mayers' apartment at approximately 10:30 a. m. on November 27, 1968. Investigation was immediately commenced by the authorities. The state's attorney conducted what is known as a State's Attorney's Inquiry at which witnesses are subpoenaed to appear and testify. At this inquiry, which was held at the police station, statements were taken from two young men who lived in the apartment below Miss Mayers. An additional statement was taken from the petitioner who at that time was employed by the Nodak Cab Company. The petitioner's testimony lasted about twenty minutes and he was permitted to leave at its conclusion. Later that same evening, complaints were prepared for the arrest of the petitioner and were submitted simultaneously along with two affidavits to the county judge seeking arrest warrants as well as the issuance of a search warrant to search Iverson's automobile and residence. Within the affidavits city detective Robert Siverson swore that at the State's Attorney's Inquiry Iverson had admitted to him that he knew one of the victims (Carol Mayers) and that on past occasions he had transported her to the Golden Hour Cafe in his cab; that Iverson had been in the victim's apartment on several occasions and that the most recent time was at 6:00 a. m. on Monday, November 25, 1968; that during the course of his conversation with Iverson, the detective observed scratches on the back of Iverson's hand and neck. In another affidavit the administrative assistant for the state's attorney's office swore that he had observed Iverson later that same day at a local bowling alley and he noticed a considerable number of scratches above his elbow on both arms. Based upon these facts a warrant was issued to search Iverson's car and residence for "ladies' garments either torn or with blood stains on them, men's garments either torn or with blood stains on them, ladies' purses, identification for Carol Mayers . . . ."

As a result of the search of Iverson's residence, a pair of trousers, a towel and a coat were seized. Blood stains were found on the trousers and towel that matched the victims' type of blood; hairs were taken from the various items that were seized which bore the same characteristics as the hair of both victims. These items were admitted into evidence at the trial.

## A. THE SEARCH WARRANT

The first issue on appeal is whether there existed probable cause for the issuance of the search warrant. We cannot agree with the district court that no probable cause existed to make the search. This case does not present the usual problems generally associated with search warrants—whether the affidavits demonstrated the reliability of an unknown informant or whether sufficient underlying circumstances were alleged to corroborate the reliability of the facts and information disclosed. See, e. g., United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Marihart, 472 F.2d 809 (8 Cir. 1972).

Here Iverson had made certain direct statements to the affiant disclosing not only his acquaintance with the victims, but the petitioner also created reasonable suspicion by disclosing that he had been at the victim's apartment in the early morning just forty-eight hours before the bodies were discovered. When this information is added to the fact that scratch marks were observed on the petitioner's hands, arms and neck, suspicion was crystalized sufficient to give reasonable cause to believe that the petitioner committed the crimes. The question is whether there was probable cause to believe that petitioner committed the crime giving rise to the search of his residence for the incriminating evidence thereafter discovered. In this regard, the North Dakota Supreme Court

aptly noted that "[i]t is reasonable to assume that in a violent crime such as murder there would be blood present, and that female victims would fight with the weapons available to them—their hands and fingernails. Accordingly, it would be reasonable to assume that their assailant would bear scratch marks." 187 N.W.2d at 28. Furthermore, since the investigation involved crimes of this magnitude we think it was reasonably established that there existed a justifiable nexus which gave cause to search the accused's living quarters and automobile for blood stained clothing. Probable cause does not require "a prima facie showing of criminal activity." Spinelli v. United States, supra 393 U.S. at 419, 89 S.Ct. at 590. We are dealing only with probabilities which the Supreme Court in Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L. Ed. 1879 (1949), characterized as "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." See also McCreary v. Sigler, 406 F.2d 1264, 1268 (8 Cir. 1969), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773; United States v. Berry, 423 F.2d 142, 144 (10 Cir. 1970). In Aguilar v. Texas, supra 378 U.S. at 111, 84 S.Ct. at 1512, the Supreme Court observed:

"Thus, when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant' . . . ." See also United States v.

Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ We concur with the observation of the North Dakota Supreme Court that:

"The affidavits in the present case are not burdened by elaborate specificity, and it is obvious that they were prepared in the midst and haste of a criminal investigation. However, when judged in a common-sense and realistic fashion, with any doubt being resolved in favor of upholding the search warrant, the affidavits in this case established the necessary probable cause, thereby justifying the issuance of the search warrant." State v. Iverson, 187 N.W.2d at 28.[1]

## B. PRELIMINARY HEARING

We come now to the district court's ruling that the petitioner was denied due process by reason of his incompetency at the time of his preliminary hearing.

Following the arrest of Iverson, a magistrate's hearing was held in order to appoint counsel and to determine if Iverson desired to waive a preliminary hearing. Iverson refused to waive a preliminary hearing and the state prosecutor then moved that the magistrate hold an incompetency hearing. Responding to this motion, the magistrate directed that a local medical examination be made of the petitioner. Doctor Bohrod, a psychiatrist at the Northeast Region Mental Health and Retardation Center in Grand Forks, and Doctor Wallace, a senior psychologist at the same institution, conducted individual examination of Iverson.[2] Both doctors found Iverson in-

---

1. The record discloses that the police had many other factors which could have been disclosed to the magistrate. Nevertheless, probable cause must turn on the facts before the magistrate and not what might have been furnished. Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); McCreary v. Sigler, 406 F.2d 1264, 1268 (8 Cir. 1969), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773.

2. Under Section 29–20–01 of the North Dakota Century Code, two experts are to be appointed to examine the accused after which a hearing to determine his competency is to be held. The statute reads as follows:

"29–20–01. *Examination of defendant's mental condition to determine whether he shall be tried.*—If, before or during the trial, the court has reasonable ground to believe that the defendant against whom an indictment has been

competent to understand the nature of the proceedings against him or to competently aid in his defense at that time. Nevertheless, the magistrate refused to hold the required statutory hearing and ruled that the state should proceed with the preliminary hearing. The magistrate interpreted the statute to require an incompetency hearing only in the event the preliminary hearing resulted in Iverson being bound over for trial. Petitioner's counsel made no objection and Iverson was held in the county jail until January 21, 1969, when the preliminary hearing took place. At the preliminary hearing petitioner's counsel appeared, cross-examined witnesses and raised several objections to the admission of the state's evidence. Iverson was not called upon to testify or present a defense. Nevertheless, the magistrate found probable cause and ordered petitioner held for trial. Thereafter the district court on February 14, 1969, ordered Iverson committed to the Jamestown State Hospital for psychiatric evaluation. Four medical experts including psychologists, psychiatrists and neurologists examined the petitioner over a two-week period. All of the mental evaluation reports concurred that petitioner was then competent to stand trial and was able to participate in his defense. After these reports were received the district court without a hearing ordered Iverson to trial. No objection was made nor was any incompetency hearing requested. There is no contention at this time that Iverson was incompetent to stand trial. Cf. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The North Dakota Supreme Court noted in its opinion that "[i]t was conceded by his [Iverson's] counsel on appeal, in oral argument, that Iverson had been examined at the State Hospital in Jamestown before his trial and that he was found to be mentally competent to stand trial." 187 N.W.2d at 34.[3]

With the issue thus limited to the preliminary hearing stage, the petitioner alleged that the holding of the preliminary hearing when there was evidence that he was mentally incompetent violated his constitutional right to effective assistance of counsel and his constitutional right to due process. The preliminary hearing in the instant case was conducted prior to the decision of Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), which held that the Sixth Amendment, as made applicable to the states through the Fourteenth Amendment, required counsel at a preliminary hearing. However, the recent case of Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972), held that *Coleman* was not retroactive. See also Konvalin v. Sigler, 431 F.2d 1156 (8 Cir. 1970). Nevertheless, the federal district court found that petitioner did not rely on the retroactivity of *Coleman,* but rather urged that there was a denial of *due process* by reason of the preliminary hearing being held at the time of petitioner's incompetency.[4] *Adams,* of course, noted that

found or an information filed is insane or mentally defective to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court immediately shall fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing, or it may commit the defendant to the state hospital at Jamestown or the state school at Grafton for observation and examination regarding his present mental condition. The proper officer of such institution shall present to the court which conducted the hearing a report regarding the defendant's present mental condition. He also may be summoned to testify at the hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party."

3. Counsel on Iverson's appeal to the North Dakota Supreme Court is the same counsel who has represented Iverson throughout the post-conviction proceedings.

4. One difficulty with the federal district court's conclusion is that there never has been an adjudication that Iverson was in fact incompetent at the time of the pre-

the failure to apply *Coleman* retroactively did not preclude a petitioner from showing actual prejudice sufficient to constitute a denial of due process. Adams v. Illinois, supra 405 U.S. at 285, 92 S.Ct. 916.

If we assume the preliminary hearing is to be considered on the same basis as the trial itself, under Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the judgment of conviction would have to be vacated. In *Pate,* the Supreme Court held that it was a deprivation of due process for the judge not to have ordered a hearing *sua sponte* on the defendant's competency to stand trial when the trial judge was put on notice by the facts developed before him in the trial of the defendant's possible mental incompetency to stand trial. Moreover, assuming the direct applicability of *Pate,* fundamental fairness would probably require that the instant case be remanded for a new trial since the court expressed doubt that any "meaningful" hearing could be held on an accused's competency to stand trial some five or six years after the fact. Pate v. Robinson, 383 U.S. at 377, 387, 86 S.Ct. 836. See also Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L. Ed.2d 824 (1960). But see Conner v. Wingo, 429 F.2d 630, 639–640 (6 Cir. 1970), cert. denied, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 121 (1972).

■■ However, we find the rule of *Pate* not controlling as to the issue before us. The preliminary hearing, although a critical and important phase of the criminal proceeding, is obviously not the trial itself. As indicated in *Coleman,* supra, a preliminary hearing is not only necessary to establish probable cause to bind over the accused, but may be used for discovery [5] and to assist counsel to inquire into possible psychiatric treatment for the accused. 399 U. S. at 9, 90 S.Ct. 1999. In fact, the Model Penal Code permits certain preliminary proceedings in a criminal case to proceed when an incompetent is represented by counsel.[6] As Mr. Justice Blackmun indicated in Jackson v. Indiana, 406 U.S. 715, 741, 92 S.Ct. 1845, 1859, 32 L.Ed.2d 435 (1972):

> "We do not read this Court's previous decisions [citing Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) and Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)] to preclude the States from allowing at a minimum, an incompetent defendant to raise certain defenses such as insufficiency of the indictment, or make certain pretrial motions through counsel." [7]

Under the circumstances we hold that Iverson's preliminary hearing conducted on January 21, with Iverson's counsel present, did not violate his due process in the absence of showing of specific prejudice. Cf. Bradley v. United States, 447 F.2d 264, 270 (8 Cir. 1971), vacated

---

liminary hearing. The Supreme Court of North Dakota observed:

> "The reports of the local psychiatrist and psychologist do not prove that Iverson was incompetent to understand the nature of the proceedings against him or to aid in his own defense. The reports are merely evidence to be considered in light of the report from the superintendent of the State Hospital to the contrary." 187 N.W.2d at 36.

5. For a recent discussion of discovery as it relates to the preliminary hearing, see Coleman v. Burnett, 477 F.2d 1187 (D.C. Cir. Mar. 14, 1973).

6. See Model Penal Code § 4.06(3) (Proposed Official Draft 1962); Model Penal

Code § 4.06 (alternative subsection 4) (Proposed Official Draft 1962).

7. Cf. Neely v. Hogan, 62 Misc.2d 1056, 310 N.Y.S.2d 63 (1970). It has been observed that a pretrial incompetency hearing may be detrimental to the accused's interest since he faces the prospect of being committed to a state institution before a preliminary hearing has even determined that there is probable cause that the accused committed a crime. See Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U.Pa.L.Rev. 832, 841–846 (1960); Note, Incompetency to Stand Trial, 81 Harv.L.Rev. 454, 468 (1967).

on other grounds, 404 U.S. 567, 92 S.Ct. 746, 31 L.Ed.2d 722 (1972).

We note that Iverson testified at trial. As indicated, there is no claim he was incompetent at that time. His statement at trial is not materially different from what he had earlier stated on November 27 as to his whereabouts and activity on the alleged night of the murders. His claim that he slept in his car on that night and did not go inside Carol Mayers' apartment was never changed. It is difficult to know in what manner he might have additionally aided his counsel at the preliminary hearing in order to call additional witnesses, cross-examine witnesses or discover exculpatory evidence.[8] We find no prejudice and no denial of Iverson's rights by the conduct of the preliminary hearing.

## C. THE STATE'S ATTORNEY'S INQUIRY

■ This brings us then to the question of whether Iverson's statement taken by the state's attorney which was the basis of the affiant's information was illegally obtained. One of the reasons this becomes material is because of its direct link with the search warrant. As stated in Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951):

> "The privilege afforded [against self-incrimination] not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute . . . . [I]f the witness, upon interposing his claim, were required to prove the hazard . . . he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question of an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

See also Malloy v. Hogan, 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Murphy v. Waterfront Commission, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); United States v. King, 402 F.2d 694, 697 (9 Cir. 1968).

■ The federal district court based its finding that the statement was illegally obtained on two factors. First, that Iverson was a suspect at the time of the State's Attorney's Inquiry and, therefore, should have been given the full warnings as required under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Secondly, the court found that there was compulsion, excluding consideration of the *Miranda* case, in such a way that it violated the petitioner's privilege against self-incrimination. We disagree with the district court's analysis that it was necessary under the facts and circumstances

---

8. Petitioner's counsel in oral argument on appeal concedes this point:

"Q. (By Judge Lay) Have you studied the transcript for the preliminary hearing?

"MR. SHAFT. Yes, I have, your Honor.

"Q. It is in this record here?

"MR. SHAFT. Yes, it is, your Honor.

"Q. Did anything develop there unforeseen that you might hold or allege prejudice arising therefrom?

"MR. SHAFT. No, I can't find anything in the record, your Honor.

"Q. Who all testified at the preliminary hearing—the officers?

"MR. SHAFT. The officers testified, other parties, I don't know whether Mr. Iverson testified. Mr. Iverson, of course, did not testify at the preliminary hearing.

"Q. He had his counsel present?

"MR. SHAFT. He had trial counsel present.

"Q. Who was trial counsel?

"MR. SHAFT. Mr. Sam Rubin.

"Q. Did he cross-examine these people?

"MR. SHAFT. Yes, he did. It was a full day preliminary examination hearing—it took the entire day."

existing here that the petitioner be given the *Miranda* warnings. The petitioner was subpoenaed on November 27, 1968, at 4:50 p. m. to report to the Grand Forks Police Station for purposes of giving information to the state's attorney's office pursuant to Section 11–19A–09 of N.D.C.C. The only warning that he was given prior to the taking of the statement was that he had a right to have an attorney present during the taking of the inquiry. This particular examination immediately followed a similar interrogation of two young men who lived in the apartment below the one in which the victims were found. The inquiry was of general nature and although it sought explanation of the petitioner's whereabouts and knowledge and acquaintance with the young ladies, it also inquired as to anyone else that the petitioner knew might have had acquaintance or contact with the two victims in the past. The federal district court was impressed by an affidavit of the court reporter present which disclosed that at the close of the interrogation a bloodhound was used in an attempt to identify the petitioner and that near the close of petitioner's statement he was asked if he would be willing to take a lie detector test.[9]

The district court felt that since there was specific suspicion directed towards the petitioner, he was a suspect and was entitled to the full *Miranda* warnings. We feel the district court misapplied the controlling legal standard. In Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court held that when an investigation had reached the accusatory stage rather than a general investigatory stage and had begun "to focus on a particular suspect," then the police had a duty to warn the suspect of his rights to remain silent and to consult an attorney. However, in Miranda v. Arizona, the Court developed a more objective standard covering the questioning by law enforcement people. The decisive stage there articulated was when "custodial interrogation begins," and "custodial interrogation" was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S., supra at 444, 86 S.Ct. 1602. This distinction is set forth and discussed by the Second Circuit at length in United States v. Hall, 421 F.2d 540, 543 (1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). There the Court of Appeals said:

"It is equally plain that 'focus' alone does not trigger the need for *Miranda*

9. The affidavit reads as follows:
"Ralph D. Krasky, being first duly sworn on oath, deposes and says:

I.

"That he is a District Court Reporter in and for the District Court, Grand Forks County, North Dakota. That on the 27th day of November, 1968 at 4:50 o'clock P.M. at the State's Attorney's inquest into the death of Carol Mayers and Diane Bill, he did transcribe and report the sworn statements of James Leroy Iverson given in response to questions asked by State's Attorney John Alphson, Orvis Olson and Robert Siverson.

II.

"That during the course of the inquiry and while James Leroy Iverson was being questioned, a recess was taken at the request of Mr. Siverson. After this recess, Iverson was asked fourteen more questions and then the record was closed at the request of Mr. Alphson. After the record was closed, this reporter and James Leroy Iverson were kept in the same room for approximately ten to fifteen minutes. During either the recess or the period of time which James Leroy Iverson and the affiant were detained after the official closing of the record, Mr. Siverson told Mr. Iverson that they would like him to take a lie detector test. Mr. Iverson indicated to the officers that he could not take it that evening and at that hour because he would miss his league bowling. Either at the recess or immediately following the closing of the record, a bloodhound entered the room from the southernmost door and walked around the room and stopped at the affiant. The bloodhound then continued to sniff about the room.

"Dated this 6th day of November, 1969.

"/s/ Ralph D. Krasky
Ralph D. Krasky"

warnings. As appears from the first *Escobedo* extract we have quoted custody as well as focus and other factors were essential to that decision. Under *Miranda* custody alone suffices. 384 U.S. at 444, 478, 86 S.Ct. 1602. We fail to perceive how one can reason from these two propositions to a conclusion that 'focus' alone is enough to bring *Miranda* into play. The only possible basis for such an argument would be that, after limiting *Miranda* to custodial interrogation and defining this as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,' 384 U.S. at 444, 86 S.Ct. at 1612, Chief Justice Warren dropped a footnote:

4. This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

While much dialetic skill has been expended on this footnote, see Graham, What is 'Custodial Interrogation?': California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A. L. Rev. 59, 114–15; Kamisar, *supra*, at 339–40, the one thing that is undeniable is that the opinion said that focus means custody, not that custody means focus. As Professor Kamisar has put it, '*Miranda's* use of "custodial interrogation" actually marks a *fresh start* in describing the point at which the Constitutional protections begin,' *id.*—Fifth Amendment protections, that is."

Accord, Lowe v. United States, 407 F.2d 1391, 1396 (9 Cir. 1969). As we ob-

10. This court has never viewed custodial interrogation as one that automatically ensues from the mere fact that there is interrogation at a police station. See United States v. Tobin, 429 F.2d 1261 (8 Cir. 1970). See also Fisher v. Scafati, 438 F.2d 307 (1 Cir. 1971); Freije v. United States, 408 F.2d 100, 103 (1 Cir. 1969), cert. denied, 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111; Clark v. United States, 400 F.2d 83 (9 Cir. 1968), cert. denied, 393 U.S. 1036, 89 S.Ct. 654, 21 L. Ed.2d 581 (1969); Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d

served in United States v. Tobin, 429 F.2d 1261, 1264 (8 Cir. 1970), the test becomes whether:

" ' * * * [I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.' United States v. Hall, 421 F.2d 540, 545 (2 Cir. 1969)."

 Obviously, the degree to which an investigation has "focused" on a particular "suspect" is not totally inapposite for if the interrogation has focused on an individual it is reasonable to conclude that the individual will not be free to leave. In the instant case, although Iverson was interrogated at the police station [10] and interrogated by the detectives when the state's attorney left, he nevertheless was never restrained or arrested and upon completion of his testimony was informed that he had a right to leave. His total interrogation lasted only twenty minutes.

We think the observation by the North Dakota Supreme Court persuasively demonstrates that Iverson was not under any custodial restraint and that in fact he was not then accused of the crime. The North Dakota Supreme Court said:

"At the time that Iverson arrived at the police station for the Inquiry, the investigation was only seven hours old. The cause of death had not been determined; the length of time the girls had been deceased was not known; witnesses had not been found who had heard or observed anything

158, 162 (1967). But see United States v. Gibson, 392 F.2d 373, 376 (4 Cir. 1968).

We feel the approach taken by the Fifth Circuit in United States v. Prudden, 424 F.2d 1021, 1030 (1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62, implements the intent of *Miranda*, namely that each factual situation must be analyzed on a case by case basis to determine whether there were such compelling factors as to necessitate the *Miranda* safeguards.

unusual relating to the girls in the past several days; substantial and revealing clues had not been found at the scene of the crime. In short, what the record reveals is that a full-scale investigation was being conducted and that the investigators were seeking any and all information that would explain the deaths of the two young women, and that up to and including the time of the State's Attorney's Inquiry, the information being gathered from all sources had not been correlated." 187 N.W.2d at 14.

■■■ Moreover, the mere fact that a person appears to answer questions by reason of a subpoena certainly does not in itself constitute such compulsion to incriminate oneself to the extent the safeguards in *Miranda* were intended to prevent. See Robinson v. United States, 401 F.2d 248, 251 (9 Cir. 1968); cf. Hicks v. United States, 127 U.S.App. D.C. 209, 382 F.2d 158, 161 (D.C.Cir. 1967).[11]

■■■ We come then to the last contention—that Iverson's statements at the State's Attorney's Inquiry were nevertheless illegally coerced. In situations where *Miranda* does not apply, the longstanding rule is whether or not the totality of the circumstances surrounding the giving of the statement demonstrates that the will of the defendant was over-

borne.[12] See Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). At the State's Attorney's Inquiry the transcript shows that the state's attorney began his questioning of Iverson as follows:

"Q. Now, this is a states attorney's inquiry as to the death of Carol Mayers and Dianne Patricia Bill. *I must advise you that you can not refuse to answer the questions.* Once the statement has been completed here and transcribed, you will be required to sign that this is your testimony. I must advise you that you have a right to have an attorney present during these questions if you so desire. What is your wish? I can tell you that the matter of the inquiry is the fact of a double murder or at least of a homicide of one nature.

"A. Okay.

"Q. Okay what?

"A. Well, you said—proceed. The statement is all right with me.

"Q. All right.

"A. I don't understand it.

"Q. All right. Mr. Iverson, now we are talking about accounting for your time from approximately 3:30 Monday.

11. The power to compel persons to testify in court or before grand juries and other governmental agencies cannot be disputed. Kastigar v. United States, 406 U.S. 441, 443, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Furthermore "[t]he mere subpoenaing of the defendant before the grand jury is not per se a violation of his constitutional rights . . . ." United States v. Bell, 351 F.2d 868, 874 (6 Cir. 1965), cert. denied, 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966). See also United States v. Morado, 454 F.2d 167, 172 (5 Cir. 1972), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116; United States v. Winter, 348 F.2d 204, 207 (2 Cir. 1965), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360. See generally Comment, The Grand Jury Witness' Privilege Against Self-Incrimination, 62 Nw.U.L.Rev. 207, 224–225 (1967).

12. The fact that Iverson's statements are more in the nature of admissions rather than confessions (e. g., he admitted being at the victim's apartment only forty-eight hours before the bodies were discovered) does not detract from applying the same constitutional principles applicable to coerced confessions since these admissions had a direct bearing on his guilt. As stated in Miranda v. Arizona, 384 U.S. at 476, 86 S.Ct. at 1629: "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense." See also Gladden v. Unsworth, 396 F.2d 373, 375–376 (9 Cir. 1968); Jones v. United States, 111 U.S. App.D.C. 276, 296 F.2d 398, 402 (1961), cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962); cf. Opper v. United States, 348 U.S. 84, 90–91, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

"A. 3:30 in the afternoon?

"Q. Right." (Our emphasis).

The federal district court found that since the state's attorney had informed Iverson that "I must advise you that you can not refuse to answer the questions," a misrepresentation of his Fifth Amendment rights occurred which rendered the giving of the statement involuntary. The state contends that the preliminary remark made by the state's attorney was simply a repetition of the statutory language[13] to the effect that the witness could not refuse to answer the questions as the "purpose and legal effect of a subpoena is to compel a witness to attend a legal proceeding and to testify."

Upon review of the overall circumstances, we conclude that the federal district court erred in holding that the state's attorney's preliminary remarks require a finding as a matter of law that Iverson's will was overborne and that the statement was given under compulsion. There is no question this is a relevant and significant factor relating to the overall inquiry which searches the "totality of circumstances" existing to determine whether the statement was voluntarily and freely given. See Davis v. North Carolina, 384 U.S. at 740, 86

S.Ct. 1761. However, there are other relevant factors to be considered.

As earlier discussed, Iverson was not arrested or otherwise in custody, the statement made by the state's attorney, although fraught with danger of misunderstanding, was earlier recited to the other two witnesses who were subpoenaed to testify to give whatever information they could to assist the police investigation. In other words, Iverson was not singled out as the only witness to whom such remarks were made. The danger that it could be misunderstood must be balanced with the fact that the interrogation of Iverson was of short duration and at no time was restraint used or threatened nor was there any accusatory or coercive means, either physical or psychological, used in the examination. Under a custodial atmosphere, we might conclude otherwise. See United States v. LaVallee, 285 F.Supp. 233 (S.D.N.Y.1968), aff'd, 417 F.2d 411 (2 Cir. 1969), cert. denied McMann v. Vanderhorst, 397 U.S. 925, 90 S.Ct. 930, 25 L.Ed.2d 105 (1970). Somewhat analogous is Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), where, although the police intentionally misrepresented to the defendant statements that an accomplice had made, the Court,

13. The pertinent North Dakota Statute provides:

"11–19A–09. *State's attorney may subpoena witnesses.*—If the state's attorney of the county shall be notified by any officer or other persons, or be cognizant himself of any violation or criminal act causing such death, or in any manner connected therewith he may inquire into the facts of such violation or criminal act, and for such purpose he shall issue his subpoena for any person who he has reason to believe has any information or knowledge of such violation, to appear before him at a time and place designated in such subpoena, then and there to testify concerning any such violation. The subpoena shall be directed to the sheriff or any constable of the county and shall be served and returned to the state's attorney in the same manner as subpoenas are served and returned in criminal cases. *Each witness* shall be sworn by the state's attorney *to testify under oath, and to*

*make true answer to all questions which may be propounded to him by such state's attorney touching any such violation or criminal act.* The testimony of every witness shall be reduced to writing, and shall become a part of the coroner's files in such case. For all purposes in this section the state's attorney may:

"1. Administer oaths or affirmations to all witnesses;

"2. Apply to the district court for the punishment of any witness for contempt for or on account of any disobedience of a subpoena, a refusal to be sworn, or to answer as a witness, or a refusal to sign his testimony; and

"3. Compel the attendance of witnesses by attachment in the manner and with the effect provided in the title Judicial Branch of Government. Any witness compelled to testify under the provisions of this section shall be entitled to counsel and all other constitutional rights." (Our emphasis.)

in examining the totality of circumstances, concluded such statements alone were not sufficient to make an otherwise voluntary confession inadmissible. See also Procunier v. Atchley, 400 U.S. 446, 453–454, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); United States v. Yeager, 446 F.2d 1360 (3 Cir. 1971); Michaud v. Robbins, 424 F.2d 971 (1 Cir. 1970). Although Iverson gave his consent to proceed as to the questioning the federal district court found it significant that he said he "did not understand." Based on Iverson's complete and coherent answers to all questions (which he repeated later that same evening) it is equally plausible that his remark related to the state's attorney's preceding statement that "the matter of the inquiry is the fact of a double murder or at least a homicide of one nature."

■ In essence, we believe a court's hindsight role in reviewing law enforcement techniques should proceed with due restraint in seizing upon isolated incidents and words as totally pervasive to void otherwise legitimate and lawful prosecutions. This does not mean that police may intentionally use illegal means to coerce confessions and that guilt will serve to make the illegality harmless error. See Lynumn v. Illinois, 372 U.S. 528, 537, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). It is still vital to our nation that police practices stay within the bounds of common decency and legality. The real inquiry in passing upon the voluntariness issue should be to ascertain whether coercive, psychological means were used in such a way as to prevent the statement from being a product of the accused's free and rational choice. See generally Developments in the Law, Confessions, 79 Harv.L.Rev. 938 (1966). The overall concern governing custodial interrogations resulted in the per se rule adopted in *Miranda.* However, where that atmosphere which justifiably provokes the concern is nonexistent, then the totality of the picture must be viewed and weighed to see if there is any substance to the claim that an individual's free will was overborne.

On the basis of the *present* record, we cannot find it here.

In reaching our conclusion, we deem it significant that the state trial court in its ruling on motion for new trial found that the defendant was not illiterate and that he was able to finish high school courses while in prison (he had been previously convicted of burglary in 1958 and 1961) and had attended Bismarck Junior College for one year in 1964. The trial court mentioned that the defendant was not unfamiliar with the procedure of arrest. On this basis the court found after careful study of Iverson's short statement that no accusations or coercion were used by the state interrogators.

■ When this issue was raised in the federal district court, it determined without an evidentiary hearing, from the state record itself, that the statement was in violation of the defendant's privilege against self-incrimination. We have noted previously that a federal district judge should exercise caution under these circumstances from determining factual questions anew without an evidentiary hearing. As stated in In re Parker, 423 F.2d 1021, 1024 (8 Cir. 1970), cert. denied Parker v. South Dakota, 398 U.S. 966, 90 S.Ct. 2182, 26 L.Ed.2d 551:

". . . [W]here the state record demonstrates procedural fairness and sufficient evidence exists to support the state court's factual findings, the statute as well as the legislative purpose of § 2254(d) makes clear that these findings are to be presumptively correct absent a showing of constitutional deficiency in the state proceeding."

The federal district court evidently felt that an evidentiary hearing was not required since it ruled that as a matter of law Iverson's privilege against self-incrimination was violated. This, as noted, was incorrect. However, there exist additional factors which justify further investigation. The federal district judge found additionally that it was "significant" that Iverson had been ex-

amined by a psychiatrist and senior psychologist on December 12, 1968, and found to be incompetent so as not to understand the nature of the proceedings against him. Whether Iverson was incompetent at the time that he gave an incriminating statement directly affects the issue of voluntariness. See Blackburn v. Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); United States v. Silva, 418 F.2d 328, 330 (2 Cir. 1969); Green v. United States, 127 U.S. App.D.C. 272, 389 F.2d 949, 952 (D.C. Cir. 1967). Although the state trial court found the statement not to be coercively given, we specifically note that the state trial judge did not evaluate or discuss the fact that on December 12, 1968, Iverson had been certified to the court as not competent to understand the nature of any legal proceedings.

■ The North Dakota Supreme Court did not discuss this fact in weighing the voluntariness of the statement. The State Supreme Court viewed this evidence as only related to the issue of whether Iverson had been deprived of due process of law by reason of his alleged incompetency at the time of his preliminary hearing. It is apparent from the briefs that the petitioner did not directly raise the incompetency issue in the state court as it affected the voluntariness of the November 27, 1968, statement. Under these circumstances, it is imperative that the state court make such determination before federal intervention in the state criminal process. Sigler v. Parker, 396 U.S. 482, 90 S.Ct. 667, 24 L.Ed.2d 672 (1970). We note that the federal district court observed that the seemingly contradictory reports of the psychiatrists in December and February could both be true at the time each examination took place. On the other hand it is equally plausible, as the North Dakota Supreme Court found, that it may be that the reports simply reflect

two conflicting viewpoints of medical doctors.[14] It should be stated, as well, in adjudicating an accused's competency, that this court has always deemed it relevant to obtain, in addition to medical opinion, laymen's observations of the accused at the time in question. See Bradley v. United States, 447 F.2d 264, 270 (8 Cir. 1971), vacated on other grounds, 404 U.S. 567, 92 S.Ct. 746, 31 L.Ed.2d 722 (1972). Investigation should be made as to his abilities to understand and communicate with the people around him. In this case, perhaps petitioner's trial counsel could give meaningful insight as to Iverson's ability to understand and to communicate with him. Although it has not been raised, this court would view it as fundamental error if in fact Iverson were incompetent at the time that he gave not only his statement to the state's attorney in the afternoon of November 27, but also the subsequent statement given that evening at the police station after he had been informed of his full *Miranda* rights. Cf. United States v. Elrod, 441 F.2d 353 (5 Cir. 1971). It is true that these statements were not used as affirmative evidence in the trial itself, but both were used for purposes of impeachment of Iverson after he took the stand. In this regard Iverson had denied on the witness stand that he had gone up to the door of the apartment on the morning in question to pick up Carol Mayers but had simply remained in his car and "beeped his horn." In both of his November 27 statements he had testified that he had gotten out of the car and gone upstairs to the apartment and pounded on the door. As the district attorney points out, this was a significant impeachment which the jury could weigh in evaluating his testimony. It is true that in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court held that if the *Miranda* warnings were

14. The February report of Doctor March indicates that the petitioner told him that ever since he was arrested he was able to advise legal counsel and to assist in his defense. Also, the electroencephalograms taken at the Jamestown Hospital contradicted the earlier suggestion by the Grand Forks' psychologist that Iverson had serious organic brain damage.

not given the statement could nevertheless be used for impeachment purposes. The *Harris* rule is specifically not applicable to statements made to police which are "coerced or involuntary." The Supreme Court observed: "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, *provided of course that the trustworthiness of the evidence satisfies legal standards.*" (Emphasis ours.) *Id.* at 224, 91 S.Ct. at 645. Any statement which is involuntarily coerced or taken from an incompetent person is not reliable and should not be used for any purpose. Whether or not Iverson was competent to understand the nature of the proceedings on the date of November 27, 1968, relates not only to the validity of the search warrant but also to the admissibility of both statements in the trial itself.

Since the state courts of North Dakota have not actually passed upon this question, we feel that the federal district court should grant ninety (90) days in which the state may hold an evidentiary hearing on the question of Iverson's competency and make a determination based on the "totality of circumstances" as to whether Iverson's statements of November 27, 1968, were voluntarily given.[15] In the event that a hearing is not held, then the federal district court is instructed that it should hold such a hearing and determine under the totality of circumstances the voluntariness of these statements. In the event the North Dakota courts find that the statements of November 27 were involuntarily given because of Iverson's then existing incom-

petency, this would vacate the conviction and require a new trial.[16] Blackburn v. Alabama, supra.

The grant of the writ of habeas corpus is vacated and the case is reversed and remanded with instructions to hold the case for ninety (90) days pending an evidentiary hearing by the state court on the issues of the voluntariness of his statements and the competency of the defendant on November 27, 1968. In the event the state does grant such an evidentiary hearing the petition for habeas corpus shall be dismissed; in the event the state does not grant the hearing, then the court shall entertain such determinations as are necessary to pass upon the issues involved.

15. In weighing the voluntariness of Iverson's statement, the evidentiary hearing should consider anew, in addition to the issue surrounding petitioner's competency at the time in question, all circumstances then existing, including, but not limited to, other relevant facts such as what warnings were or were not given, the preliminary remarks of the state's attorney, the responses of Iverson, the surroundings, etc. As stated, the essential issue is whether the statements given were the product of the accused's free and rational choice.

16. In the event the case is ever brought back to the federal district court, petitioner may then renew his claim that he was not afforded effective assistance of counsel. The State Supreme Court determined that he was afforded competent counsel; however, as indicated, the federal district court did not pass on this question.