774 F.2d 1164
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
United States of America, Plaintiff-Appellee,
v.
Vernon Neal Hale, Lina Joyce Hale, Defendants-Appellants.
 Nos. 85-5036, 85-5037
 United States Court of Appeals, Sixth Circuit.
 9/17/85
 
 W.D.Ky.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY
 Before: JONES and CONTIE, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Vernon and Lina Hale appeal from a jury verdict convicting them of violations of 18 U.S.C. Secs. 371, 1341 alleging insufficient evidence, erroneous admission of prior acts evidence, Fed. R. Evid. 404(b), and failure to supress evidence produced in compliance with a subpoena duces tecum without Miranda warnings. For the reasons that follow, we affirm.
 
 I.
 
 2
 On July 3, 1984, defendants Vernon Neal Hale and Lina Joyce Hale were each indicted on nine charges of mail fraud, pursuant to 18 U.S.C. Sec. 1341, and one count of conspiracy to commit mail fraud, 18 U.S.C. Sec. 371. The conspiracy count alleged that the Hales placed ads in several publications soliciting persons to stuff envelopes at home. When persons responded, they were required to forward an application fee, after which they were instructed to place similar ads. As overt acts, the government alleged the Hales' use of post office boxes, payments for the ads in question, and payment for mail forwarding service. With respect to the mail fraud counts, the indictment cited the Hales' advertisements, the correspondence sent to applicants both prior to and after remittance of the $25 fee, and referred to nine individuals who responded to the advertisements.
 
 
 3
 On September 6, 1984, the Hales filed a motion to suppress the evidence obtained by a subpoena duces tecum served on the Hales. The subpoena required the Hales to appear in district court on May 3, 1982, and to produce a variety of documents relating to the Hales' business transactions. On September 11, 1984, the government moved in limine for the court to allow admission of a False Representation Order entered by the Postal Service. On October 26, 1984, the district court denied the motion to suppress. On October 29, a jury trial began, and, on November 1, the jury found the Hales guilty on all counts except count 9 which was nolle prossed. On December 12, the Hales filed a motion for judgment of acquittal or for a new trial, and on January 2, 1985, the court entered judgment and sentenced defendants.
 
 
 4
 The documents which the Hales allegedly sent to those who responded to their ads read in part.
 
 
 5
 We'll pay you 75cents for each envelope you stuff and return to us--according to our instructions. Now! As an independent mailer you can earn money and respect in your own advertising-mailing business, substantially consisting of SIMPLE-PLEASANT-PROFITABLE-STUFFING-MAILING ENVELOPES at home!
 
 
 6
 Further,
 
 
 7
 You will not be required to buy any envelopes or postage stamps. We will gladly furnish all circulars without charge for as long as you want to participate. By following our instructions--via classified ads you will receive pre-addressed envelopes with postage stamps already affixed. As you can see, the biggest part of your job will be securing envelopes, stuffing them with circulars and sending them to us for payment.
 
 
 8
 For further information, the reader was required to send $25. The flyer noted that '[y]ou will be an independent mailer, not an employee.' The scheme also offered a free vacation trip. The instructions the victims received instructed them to place ads in newspapers to solicit persons to send them envelopes which would then be forwarded to the Hales.
 
 
 9
 The Administrative Civil Order, dated May 22, 1981, introduced at trial found that the Hales' businesses, National Mailing Services, Success Publishing Company, and Management Services International 'are engaged in conducting a scheme or device for obtaining money or property through the mails by means of false representations in violation of 39 U.S. Code 3005 . . . with respect to envelope stuffing work.' The order, addressed to the Postmaster at St. Louis and Scottsville, Kentucky placed limits on the companies' use of postal money orders or receipt of mail related to envelope stuffing.
 
 
 10
 Vernon Hale's testimony at the suppression hearing indicated that both Hales and their children participated in the mechanics of the scheme, but Vernon testified that his wife acted only at his direction and did not participate in management of the enterprise. Vernon testified that he received the administrative complaint but did not defend it because he thought he would have to go to Washington, D.C., and get a lawyer.
 
 
 11
 With respect to the subpoena, Vernon said that when he delivered the records he asked Assistant U.S. Attorney Allan Sears if Vernon could talk to the grand jury. Sears said 'no,' and never told Vernon that he was a defendant or a target in the case. Postal Service Inspector Dennis Peil testified that he learned about the Hales in 1981 and that Hale was not informed of his rights when the subpoena was served on him.
 
 
 12
 At trial, Peil described how the investigation began and how he tracked down the various post office boxes held in the names of different Hale companies. Peil interviewed the Hales at their home on March 11, 1982 with Inspector Rothmeich. Hale denied that he owned any of the companies and said that he just worked as a remailer for them. Mrs. Hale confirmed this. Hale said that he forwarded everything to the companies in Bermuda, but would not reveal the officers of the companies. The Hales said they opened all the post office boxes to establish residence. Peil warned the Hales that if they refused to reveal any information, Peil would seek a grand jury subpoena. Peil received a letter dated April 8, 1982 from Vernon and Joyce Hale in which they admitted that the companies were theirs and asked Peil to stop over and review their records. None of the statements the Hales gave Peil were written or recorded.
 
 
 13
 Pauline Foldager responded to the Hales' ad in the National Enquirer and 'figured there would be circulars and envelopes and stamps and things like that.' Foldager sent in $28 and figured she would get her kit. Foldager did not follow the instructions she received because she did not have the money to place an ad and testified that 'I wasn't expecting this at all. This was the farthest thing from my mind. . . .' Foldager did not get the booklets or vacation coupon she was promised. Foldager was confused by the reference in the instructions to classified ads. Foldager bought a typewriter because she thought she might need one to address envelopes.
 
 
 14
 Betty Curl responded to an ad in True Story and 'figured that I would get the envelopes and the stamps and I would have my own job at home working in my own free time.' Curl sent in her money, $28, and received a certificate for a free vacation. Curl also testified that she had no money for an ad, and that the company was asking her to rip-off people.
 
 
 15
 Eunice Beh responded to an ad in True Story and '[m]y impression is that I am going to make $1,500 a week if I should start stuffing the envelopes.' Beh sent in her money and got her vacation certificate, but did not place an ad because she could not afford it.
 
 
 16
 Jacqueline Larson responded to an ad in the National Enquirer and thought she 'was going to get some envelopes with circulars to put in them.' Larson sent in $25, but did not receive anything.
 
 
 17
 Elaine Lowery responded to a similar ad, sent in the money, and received the instructions to place an ad in a magazine, but did not have the money for an ad, so she just placed the ad on a bulletin board. She got five or six responses and mailed them back to the Hales' company, Treasure Pak, but did not get anything back in return. She was never informed that she had to place an ad until after she sent her money.
 
 
 18
 Cheryl Neihoff testified that she sent in her $28, and got a different story from the instructions than from the ads. Neihoff did not place an ad 'because I didn't have anymore money to spend on it and it seemed to me that I would be taking advantage of others as I was taken advantage of.'
 
 
 19
 Gary Roenhildt testified that he did not send in his money because the literature was
 
 
 20
 vaguely worded . . . that I couldn't make out what they were really offering me or what they were trying to sell me, and the bottom line for me was that they wanted me to send them $25.00 before they would tell me how the plan worked.
 
 
 21
 Charles DiMuro turned the offer into the postal authorities because he felt there was something wrong with it, but he was not misled by it personally.
 
 
 22
 The government introduced the Administrative Order as 'evidence of prior similar acts that make their continuation of the particular business that they were in and charged with in this indictment probative of their intent and knowledge that the scheme was illegal.' The court allowed admission of the order and instructed the jury:
 
 
 23
 These 2 accused are on trial only for the offenses which are set out in the indictment and nothing else. I have permitted the admission of Exhibit 16 for consideration by the jury for only 1 purpose. The Exhibit may be considered by the jury only insofar as it may tend to show, if it does show, knowledge or intent on the part of the accused.
 
 II.
 
 24
 Defendants argue that the evidence was insufficient because (1) the value or lack thereof of defendants' scheme was not tested since those responding never completely followed the instructions; (2) the scheme would not deceive persons of ordinary prudence; and (3) no false representations were made in the course of the scheme.
 
 We have recently held that
 
 25
 In addressing the sufficiency of the evidence, this Court does not sit as a trier of fact in a de novo trial. Rather, the standard of review for claims of insufficient evidence is:
 
 
 26
 whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 
 27
 Jackson v. Virginia, 443 U.S. 307, 319.
 
 
 28
 United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir. 1985); United States v. Stone, 748 F.2d 361, 363 (6th Cir. 1984). Defendants were convicted of mail fraud pursuant to 18 U.S.C. Sec. 1341 which provides:
 
 
 29
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more that $1,000 or imprisoned not more than five years, or both.[1]
 
 
 30
 'Courts have consistently held that the essential elements of a mail fraud prosecution are (1) a scheme to defraud; and (2) the use of the mails to execute that scheme. . . . It is equally well established that a specific intent to commit fraud is an essential element of the crime.' United States v. Goodpaster, Case No. 84-5668, slip op. at 5-6 (6th Cir., August 5, 1985). 'It is well established that a conviction under Sec. 1341 does not require proof that the intended victim was actually defrauded.' Id. at 8.[2] Accordingly, defendants' contention that the victims did not follow their instructions is irrelevant. There is no need to show that the victims were actually defrauded, and, even if such a showing was necessary, the victims in this case were actually defrauded. After they sent in their money, they learned the true character of the deal, learned that they had been duped, and, accordingly, cut their losses by declining to participate further in the scheme.
 
 
 31
 With respect to the gullibility of the victim, we have held that the scheme must be 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979). The convictions are supported by sufficient evidence. While the letters did specifically indicate that the victim was to procure envelopes via classified ads, the nature of the literature, its emphasis on easy money, and the simple fact that prudence implies some reasonable degree of scruples would mislead even the ordinary person with respect to the real mechanics of the scheme. That most of the victims who testified were so misled is probative of the misleading nature of the scheme.
 
 
 32
 Defendants also argue that their materials contained no false statements. In Van Dyke, we observed that 'the scheme to defraud element required under Sec. 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." 605 F.2d at 225. However, 'a scheme may be fraudulent even though no affirmative misrepresentation of fact be made. . . . The deceitful concealment of material facts may also constitute actual fraud.' Blachly v. United States, 380 F.2d 665, 673-74 (5th Cir. 1967); United States v. McNeive, 536 F.2d 1245, 1249 n.10 (8th Cir. 1976); Henderson v. United States, 202 F.2d 400, 404 (6th Cir. 1953).
 
 
 33
 Moreover, deceitful statements of half truths or the concealment of material facts is actual fraud violative of the mail fraud statute. . . . [T]he deception need not be premised upon verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance.
 
 
 34
 . . . While it is true that exaggeration within reasonable bounds under the circumstances will not support a finding of a scheme to defraud, a substantial deception . . . is sufficient.
 
 
 35
 Lustiger v. United States, 386 F.2d 132, 138 (9th Cir. 1967), cert. denied, 390 U.S. 951 (1968). The Hales' activities cannot be termed mere exaggeration. The crime inherent in their conduct is the concealment of material facts about their scheme which they used to induce people to send them money through the mails. The evidence is sufficient to support the convictions.
 
 III.
 
 36
 The Hales object to the trial court's admission of an Administrative Civil Order, issued by the U.S. Postal Service pursuant to 39 U.S.C. Sec. 3005, which found that companies owned by the Hales had engaged in mail fraud in relation to an envelope stuffing scheme.[3] Defendants raise at least four objections to use of the evidence. First, defendants contend that the evidence is not admissible as inextricably intertwined with the crime charged, and, therefore is admissible only if it qualifies under Fed. R. Evid. 404(b). See United States v. Levy, 731 F.2d 997, 1001-04 (2d Cir. 1984) United States v. Torres, 685 F.2d 921, 924-25 (5th Cir. 1982). The government and the district court agreed with this proposition. The evidence was clearly admitted pursuant to Rule 404(b).
 
 
 37
 Second, defendants contend that it was improper to allow admission of the order since the Hales did not defend due to the anticipated expense. Accordingly, defendants would analogize the order to a consent decree, which has been found not to be a 'wrongful' act within the meaning of Rule 404(b). See United States v. Cook, 557 F.2d 1149, 1152 (5th Cir. 1977), cert. denied, 434 U.S. 1020 (1978). But see New England Enterprises, Inc. v. United States, 400 F.2d 58, 70 (1st Cir. 1968), cert. denied, 393 U.S. 1036 (1969). The district court instructed the jury that the civil order could only be considered on the issue of intent. For two reasons, appellants' objection is meritless. First, even though the Hales did not contest the complaint, the order indicates that the evidence supports the order, and, accordingly, it is an adjudication on the merits unlike a default judgment or a consent decree. Second, even if the order had no evidentiary basis, the order would be probative of the Hales' intent to the extent it reflects the fact that they had notice that the conduct they were engaged in was illegal.
 
 
 38
 Third and fourth, appellants contend that the acts on which the civil order was based were not similar to the acts charged in the indictment, and that the prejudice that might result from introduction of the order outweighed its probative value.
 
 
 39
 Before admitting prior acts evidence, the district court must determine that the evidence is admissible for a proper purpose and that the probative value of the evidence outweighs its potential prejudical effects. . . . The district court has broad discretion in balancing probative value against potential prejudicial impact. . . . Furthermore, the prior acts generally must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment.
 
 
 40
 United States v. Ismail, 756 F.2d 1253, 1259 (6th Cir. 1985). The civil order indicates that a scheme of envelope stuffing work was involved. This conduct was sufficiently similar to be probative of intent in this case. The prejudice of which appellants complain is simply the probativeness which makes the act useful and, therefore, admissible. The probative value of the act outweighed its prejudice, and the district court did not abuse its discretion in admitting it. United States v. Weidman, 572 F.2d 1199, 1202-03 (7th Cir.), cert. denied, 439 U.S. 821 (1978).
 
 IV.
 
 41
 Vernon Hale contends that he should have been read his Miranda rights before he complied with the subpoena and turned over the incriminating documents. This assignment of error is frivolous. The Court has emphasized that 'Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). '[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment." Id. 'The mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings. . . .' Minnesota v. Murphy, 104 S. Ct. 1136, 1145 (1984). Further, '[i]t may well be true . . . that the 'starting point' for the criminal prosecution was the information obtained from petitioner and the records exhibited by him. But this amounts to no more than saying that a tax return signed by a taxpayer can be the 'starting point' for a prosecution.' Beckwith v. United States, 425 U.S. 341, 347 (1976). See also Inverson v. North Dakota, 480 F.2d 414, 424 (8th Cir.), cert. denied, 414 U.S. 1044 (1973) ('the mere fact that a person appears to answer questions by reason of a subpoena certainly does not in itself constitute such compulsion to incriminate oneself to the extent the safeguards in Miranda were intended to prevent.'); United States v. Luxenberg, 374 F.2d 241, 246 (6th Cir. 1967). Hale was not entitled to Miranda warnings, and the district court appropriately denied the motion to suppress.
 
 
 42
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The convictions on Count I were for conspiracy to commit mail fraud pursuant to 18 U.S.C. Sec. 371 which provides in pertinent part:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 See United States v. Shelton, 669 F.2d 446, 451 (7th Cir.), cert. denied, 456 U.S. 934 (1982).
 
 
 [2]
 As to proof of conspiracy under 18 U.S.C. Sec. 371, it is necessary to show only that (1) the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that at least one of the conspirators thereafter knowingly committed at least one of the overt acts charged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy
 United States v. Strong, 702 F.2d 97, 100 (6th Cir. 1983).
 
 
 [3]
 39 U.S.C. Sec. 3005(a) provides:
 Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, including the mailing of matter which is nonmailable under section 3001(d) of this title, or is engaged in conducting a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind, the Postal Service may issue an order which----
 (1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender;
 (2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note; and
 (3) requires the person or his representative to cease and desist from engaging in any such scheme, device, lottery, or gift enterprise.
 See also 39 U.S. C. Sec. 3005(d).